Tamara BAILEY, et al., Plaintiffs,

v.

SOUTHEASTERN AREA JOINT AP-
PRENTICESHIP COMMITTEE,
Defendant.

Civ. A. No. 79–0004–P(H).

United States District Court,
N.D. West Virginia,
Parkersburg Division.

April 5, 1983.

See also, D.C., 480 F.Supp. 274.

J. David Cecil, Charleston, W.Va., for plaintiffs.

Thomas H. Marshall, Robert L. Dameron, Stanley L. Basler, Blake & Uhlig, Kansas City, Kan., Robert Smith, Charleston, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

The Plaintiffs bring this action to recover monetary and injunctive relief against the Defendant, Southeastern Area Joint Apprenticeship Committee (SAJAC), pursuant to Section 706(f) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f). Commencing on April 21, 1982, the Court conducted the trial of this action, at the

conclusion of which on April 23, 1982, it made a bench ruling wherein it analyzed the evidence in the case and found that the screening mechanism which was developed and employed by SAJAC had a disparate impact on the two women Plaintiffs, in violation of their rights under Title VII. The Court is now issuing this Memorandum Opinion and Order so as to memorialize its prior bench ruling.

The subject matter of this litigation is the Plaintiffs' claim that they were individually and generally discriminated against as women by virtue of the Defendant's design, implementation and operation of the screening mechanism [1] which excluded them, as women applicants,[2] from being accepted into the Defendant's apprenticeship and training program, in violation of their rights under Title VII. The Court's determination of whether the Defendant violated the Plaintiffs' rights under Title VII, therefore, follows from its resolution of the issue of whether SAJAC's designed screening mechanism had a disparate impact [3] on these women Plaintiffs.[4]

In order to prevail on their Title VII claims, the Plaintiffs must prove by a preponderance of the evidence (1) that they are members of a protected class, (2) that they applied and were qualified for an apprenticeship training program for which the Defendant was seeking applicants, (3) that, despite their qualifications, they were rejected, and (4) that, after their rejection, the Defendant accepted others of similar or less qualifications into its apprenticeship program. *Cf. McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In addition, the Plaintiffs must also prove by a preponderance of the evidence that the Defendant's screening mechanism, the results of which caused their exclusion from the apprenticeship program, was not a "reasonable measure of job performance." *See Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In attempting to meet this burden of proof, the Plaintiffs rely on the parties' Agreed Statement of Facts, the testimony of expert witnesses attacking the validity of the Defendant's screening mechanism, and occurrence evidence in the form

---

1. When speaking of the Defendant's screening mechanism, the Court is referring to the overall design, implementation and operation of those procedures which results were used by the Defendant in determining whether to accept or reject a particular applicant into its apprenticeship program. The Court further notes that the aptitude testing component of the screening mechanism was excised from the screening mechanism well in advance of 1978 when the Plaintiffs applied for admission into the program. *See* ¶ 27 of the Agreed Statement of Facts, *infra.*

2. Since March 24, 1972, employers and unions have been proscribed from discriminating against *applicants* on the basis of sex. *See* Section 8 of Public Law No. 92–261, amending 42 U.S.C. § 2000e–2.

3. In passing upon the evidence presented, the Court must analyze it so as to determine whether the Plaintiffs have proved by a preponderance of the evidence either that they have suffered disparate treatment at the hands of the Defendant, or that they have been adversely affected by the disparate impact of the challenged screening mechanism. Either analysis, or both, may be appropriate under a given set of facts. *See Furnco Construction Corporation v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Wright v. National Ar-*

*chives and Records Service*, 609 F.2d 702 (4th Cir.1979) (*en banc*).

In the case at bar, however, the Court finds that a disparate treatment analysis would be inapposite for the following reasons. First, the evidence indicates that the Plaintiffs' only contact with the Defendant was through their interaction with the Defendant's screening mechanism which was developed and designed to be administered generally throughout SAJAC's seventeen locals. Second, the evidence in this case is absolutely devoid of any indication of overt discriminatory intent or actions by the Defendant or its agents against these Plaintiffs.

4. Inasmuch as this is *not* a class action, the Court recognizes that it must focus its attention on the two individual Plaintiffs at bar. Likewise, the Court clearly accepts the proposition that the demographical history of the boilermaking trade is *not* involved in this litigation. Therefore, borrowing defense counsel's illustration, the fact that the history of the boilermaking trade would prove that more than 99% of the Boilermakers in Local 667's jurisdiction are men is not directly relevant to the Court's determination of whether the Defendant's screening mechanism had a disparate impact on the Plaintiffs.

of both the Plaintiffs' testimony and their exhibits.

## I. Finding of Facts

### A. Timeliness, 42 U.S.C. § 2000e–5(f)(1)

■■■ In resolving a preliminary matter in controversy in this action, the Court finds by a preponderance of the competent evidence in the case that the Plaintiffs Bailey and Blake received[5] their Right to Sue letters from the EEOC on October 16, 1978, by service on their lawyer, and that they instituted this action ninety-one days later on Monday, January 15, 1979. Even though the ninety-day limitation period for the commencement of this civil action[6] expired on Sunday, January 14, 1979, it is nevertheless timely where it was filed on the next succeeding judicial day. See Bailey v. Boilermakers Local 667, 480 F.Supp. 274, 281–82 (N.D.W.Va.1979), citing Pearson v. Furnco Construction Co., 563 F.2d 815, 818 (7th Cir.1977). Accord, Milam v. U.S. Postal Service, 674 F.2d 860 (11th Cir.1982); Kane v. Douglas, Elliman, Hollyday & Ives, 635 F.2d 141 (2d Cir.1980).

### B. Agreed Statement of Facts

Prior to the trial of this action, the parties submitted to the Court an Agreed Statements of Facts, wherein they stipulated the following findings of fact, which the Court hereby adopts as its own:

(1) The plaintiffs, Tamara Bailey and Nancy Blake, are both citizens and residents of the Northern District of West Virginia, are females who, at all times material hereto, were over the age of eighteen years, were high school graduates, and had no physical handicaps that would prevent performance of work in the boilermaking trade.

(2) The defendant, Boilermakers Southeastern Area Joint Apprenticeship Committee ("SAJAC"), is a joint labor management committee as the term is used in 42 U.S.C. Section 2000e–2(d). SAJAC is composed of a total of twelve committeemen, six of whom are chosen to represent the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO, ("International Brotherhood of Boilermakers") and seventeen of its affiliated Local Lodges located within the territorial jurisdiction of the Southeastern Area Joint Apprenticeship Program ("SAJAP") and six of whom represent contractors signatory to certain collective bargaining agreements with the International Brotherhood of Boilermakers and/or its affiliated Local Lodges, and who operate jobsites within the territorial jurisdiction of SAJAP.

(3) The committee members representing the Boilermaker Unions are appointed by the Union bargaining committees for the Southeastern States Articles of Agreement and the Ohio Valley Articles of Agreement, collective bargaining agreements governing the employment relationship between the signatory employers and their boilermaker employees engaged in the field construction and repair industry. The committee members representing the signatory employers are appointed by the employers' bargaining committees for the two aforementioned collective bargaining agreements.

(4) At all times material to this proceeding, there has been no member, officer, or employee of Local Lodge 667, International Brotherhood of Boilermakers, who has been a member of SAJAC.

(5) It is the responsibility of SAJAC to administer within its territorial jurisdiction the Boilermaker National Apprenticeship Program for Boilermakers in the Field Erection and Repair Industry (the National Program). The National Program was established pursuant to the terms of the Agreement and Declaration of Trust for

---

5. The ninety day period within which a civil action must be commenced under Title VII begins to run when the Plaintiff receives a Right to Sue letter from the EEOC. Russell v. American Tobacco Co., 528 F.2d 357, 365 (4th Cir. 1974) cert. denied, 425 U.S. 935, 96 S.Ct. 1665,

48 L.Ed.2d 176 (1976); Bradley v. G. & W.H. Corson, Ins., 501 F.Supp. 75 (E.D.Pa.1980); Menn v. Amstar Corp., 476 F.Supp. 303 (D.Md. 1979).

6. . 42 U.S.C. § 2000e–5(f)(1).

*Boilermaker Area Apprenticeship Funds,* a trust agreement between the International Brotherhood of Boilermakers and employers in the boilermaker field erection and repair industry. The Agreement and Declaration of Trust sets forth the terms and conditions for utilizing funds contributed by employers for the purpose of apprenticeship training pursuant to the terms of the collective bargaining agreements.

(6) The terms of the aforementioned trust agreement also establish a National Joint Apprenticeship Board (National Board) composed of an equal number of employer and Union representatives which is empowered to adopt and amend national standards of apprenticeship training and to reduce to writing the national program of apprenticeship training setting out in detail all of the provisions and requirements of the program.

(7) Pursuant to authority granted to it in the aforementioned Trust Agreement, the National Board has promulgated the *National Standards of Apprenticeship for Boilermakers in the Field Erection and Repair Industry* (National Standards) which were developed in accordance with the basic standards recommenced by the Bureau of Apprenticeship and Training, United States Department of Labor, and which has been registered with and approved by that agency as incorporating its recommended standards.

(8) Pursuant to authority granted to it in the Agreement and Declaration of Trust, the National Board has promulgated and implemented the *Affirmative Action Plan and Procedures for Qualifying, Testing, Interviewing and Rating Apprentice Applicants,* ("Selection Procedures") which govern the process of selecting applicants eligible for entry into the apprenticeship program and ranking them in accordance with criteria set forth therein. The Selection Procedures were developed in accordance with the Federal Regulations promulgated by the Secretary of Labor, United States Department of Labor, found at 29 Code of Federal Regulations, Part 30. The Selection Procedures have been registered with

and approved by the United States Department of Labor, Bureau of Apprenticeship and Training.

(9) The Selection Procedures have been revised several times since their initial adoption. Each revision has been approved by the U.S. Department of Labor, Bureau of Apprenticeship and Training. The Selection Procedures in effect from March, 1972 until October, 1978 appear as Joint Exhibit No. 2. The Selection Procedures which went into effect in October, 1978 and which are currently in effect appear as Joint Exhibit No. 11.

(10) The Boilermakers National Apprenticeship Program is divided into six areas created pursuant to the aforementioned Agreement and Declaration of Trust. Each of the six areas has its own Joint Apprenticeship Committee responsible for administering the program within its territorial jurisdiction covering a section of the United States. The territorial jurisdiction of SAJAC includes all or portions of fourteen different States including Florida, Georgia, Tennessee, Alabama, Mississippi, North Carolina, South Carolina, Maryland, Delaware (except New Castle county), Kentucky, Virginia, West Virginia (except Hancock county), and portions of Ohio and Indiana as well as the District of Columbia.

(11) Pursuant to obligations imposed by the aforementioned Agreement and Declaration of Trust, SAJAC, like the other area committees, has adopted area standards approved by the National Board as conforming to the National Standards promulgated by it. SAJAC activities are guided by the *Southeastern Area Apprenticeship Standards for Boilermakers (Field Erection and Repair)* ("Area Standards"), the current version of which was adopted and became effective October 1, 1973. The SAJAC's Area Standards conform with the National Standards promulgated by the National Board and have been registered with and approved by the United States Department of Labor, Bureau of Apprenticeship and Training, as incorporating its recommended standards. The *Southeastern Area Apprenticeship Standards for Boilermakers,* in ef-

fect at all times material hereto appears as Joint Exhibit No. 1.

(12) SAJAC supervises, administers and controls the apprenticeship program on behalf of Local Lodge 667 and sixteen other Local Lodges affiliated with the International Brotherhood of Boilermakers and located within the territorial jurisdiction of SAJAC.

(13) The objective of the Apprenticeship Program administered by SAJAC is the training of field construction boilermakers skilled in all phases of the boilermaking erection and repair industry. Journeyman field construction boilermakers are skilled craftsmen who engage in the fabrication, erection, maintenance and repair of energy generating systems and their appurtenances for industries such as power plants, breweries, distilleries, petroleum refineries, chemical plants, paper mills, etc. Their work involves *inter alia*, the cutting, welding, fitting and placement of heavy gauge plate steel and the rigging and other physical functions incidental thereto as well as welding on stainless steel, aluminum, and other exotic metals capable of withstanding extreme heat or pressure such as boiler tubes.

(14) The boilermaking craft is considered strenuous, physical work with lifting at times in the range of from 50 to 100 pounds. The work is performed both indoors and outdoors under circumstances where noise is present and often vibration.

(15) Individuals engaged in the field construction boilermaking trade, including apprentices, must be willing to, and frequently do, travel. In addition, field construction boilermakers, including apprentices, must be willing to, and frequently do, work at great heights sometimes in excess of 200 feet. They frequently work under exposure to extreme weather conditions and under unavoidably hazardous conditions. Boilermakers often work in groups and under fairly close supervision. They often work from scaffolding and laders [sic].

(16) With respect to aptitudes required to perform satisfactorily in the boilermaker trade, the following apply: (1) A general intelligence level that would be found in the mid-third of the United States population if graphed upon a Bell Curve as such is used in statistics; (2) numerical aptitude, at a level that would be found in the mid-third of the population; (3) special aptitudes at a level that would be found in the upper-third of the population; (4) form perception, at a level of the mid-third of the population; (5) coordination, at a level of the mid-third of the population; (6) finger dexterity and manual dexterity, at a level of the mid-third of the population.

(17) SAJAC has the responsibility of establishing apprenticeship training standards and procedures in its area including eligibility requirements, training requirements, and graduation requirements. SAJAC supervises, administers and controls the selection and ranking process which results in a pool of applicants eligible for entry into the apprenticeship program through the Boilermaker Local Lodge involved. SAJAC's activities in that connection are guided by the Selection Procedures as promulgated by the National Board.

(18) SAJAC is an unincorporated association under the laws of the 14 states abovementioned, including the state of West Virginia, and has its offices in Florence, Alabama.

(19) The activities of SAJAC are funded entirely by contributions required from employers pursuant to the terms of collective bargaining agreements and the program receives no financial assistance from state or federal governments.

(20) SAJAC has appointed and employed an Area Coordinator who is in charge of the day-to-day activities involved in the supervision, control and administration of the apprenticeship program. The Area Coordinator at all times material hereto, and presently, is Larry A. Phillips whose offices are located in Florence, Alabama.

(21) Larry A. Phillips became the Area Coordinator in 1976. Prior to assuming that position, Larry Phillips was an Assistant Area Coordinator with the SAJAP, a position which he occupied continuously from October, 1968. Prior to obtaining the

position of Assistant Area Coordinator, Larry Phillips practiced the boilermaking trade for a period of ten years, four years as an apprentice boilermaker and six years as a journeyman boilermaker.

(22) The Area Coordinator is responsible for administering the screening, selection, and ranking of applicants to the apprenticeship program for the purpose of creating pools of applicants eligible for entry into the program. There is no master list of applicants eligible for entry into the SAJAP. Instead, applications are taken from persons interested in entering the Program in the locality of the particular Lodge. The names of those persons are then ranked according to a ranking system determined by the written selection procedures on an eligibility roster compiled for and maintained at the particular Local Lodge involved. The Local then uses the list to select persons for referral to jobs as apprentices as positions become available within the locality of that Local.

(23) Each of the seventeen Boilermaker Local Lodges is responsible for determining and maintaining the size of its pool of indentured apprentices. An applicant whose name appears on an eligibility roster is eligible for entry into the apprenticeship program only through and within the jurisdiction of the Local Lodge on whose eligibility roster such applicant's name appears.

(24) The actual process of indenturing an applicant eligible for entry into the program commences when the Business Manager of the Local Lodge involved selects the applicant's name from the eligibility roster and refers that individual to work as an apprentice. The Business Manager then notifies SAJAC offices of the applicant's name from the eligibility roster and refers that individual to work as an apprentice. The Business Manager then notifies SAJAC offices of the applicant's name and the date that he/she was sent to work. The Area Coordinator then sends the particular applicant the indenturement materials which include an indenturement agreement which he/she must sign and return to the SAJAC

offices. The indenturement agreement is also signed by the SAJAC Chairman and Secretary and a Bureau of Apprenticeship and Training Representative. From that point on the individual is an indentured apprentice in the Local Lodge through which he/she was indentured and is eligible for referral only through that Lodge.

(25) The Plaintiffs in this action, both female, applied for entry into the Apprenticeship Program through Boilermaker Local Lodge 667 in January, 1978. Although both Plaintiffs satisfied the eligibility requirements and were eligible for entry, they were not among those who were selected to be indentured.

(26) At the time that Plaintiffs applied for entry into the program, the requirements for eligibility as applied to all applicants were as follows:

(a) Must be at least 18 years of age and not over 26 at the time of making application; [7]

(b) Must have graduated from high school or be able to provide equivalency certificate;

(c) Must have no obvious physical handicaps that would prevent performance of the work covered by the boilermaker trade;

(d) Must indicate willingness to travel;

(e) Must agree to pursue the studies course related to the apprenticeship training;

(f) Must indicate no fear of high or hazardous work; and

(g) Must report for an oral interview.

(27) Up until 1974 applicants were also required to take an aptitude test. Prior to 1972 the aptitude test was conducted by SAJAC. After 1972 and until the requirement was dropped by SAJAC in 1974, an aptitude test was conducted by the state employment services of the state in which the particular Local Lodge was located. A passing score in the aptitude test was an eligibility requirement when it was in use. The Plaintiffs are not alleging to be dis-

---

7. The maximum age requirement was deleted in May, 1978.

criminatory the eligibility requirements set forth in Paragraph 26 above.

(28) At the time the Plaintiffs applied for admission, both met the above-stated qualifications. Tamara Bailey was a graduate of Daniel Hand High School in Madison, Connecticut, and she had some seven months experience in the boilermaking trade at the time of her application. Nancy Blake was a graduate of Magnolia High School in New Martinsville, West Virginia, and she had some three months experience in the boilermaking trade as of February, 1978, the date of her oral interview.

(29) Applicants who satisfy the eligibility requirements are then ranked according to a process established by the Selection Procedures. The process involves accumulating points based upon education, training, experience, military service, and an oral interview. Applicants are required to provide proof verifying the additional rating points desired in connection with education, training, experience and military service. All applicants are then ranked from highest to lowest according to the total points each received.

(30) The ranking process is conducted by the Area Coordinator and his assistant in the offices of SAJAC. A Boilermaker Apprentice Evaluation Summary sheet is prepared for each applicant. Since 1972 points have been assigned for the various categories contained on the evaluation summary sheet as follows:

(a) *High School Grades.* Applicants are awarded points based upon their educational background. Five points are awarded applicants who received the grade of "A" in math courses in high school, five points for applicants who made the grade of "A" in science courses in high school, and five points for applicants who made the grade of "A" in shop courses in high school. In like manner, applicants who made a grade of "B" were entitled to two (2) points in each of the aforenamed subjects; applicants who made a grade of "C" were entitled to one (1) point for each of the three aforementioned subjects.

(b) *College.* Applicants receive five (5) points for each year of college completed with a maximum of two (2) years or a total of ten (10) points.

(c) *Related Vocational School.* Applicants are awarded ten (10) points for each year of related vocational school completed to a maximum of four (4) years of forty (40) points. Related vocational training is not defined in the Selection Procedure.

(d) *Military Service.* Applicants are awarded points based on their prior military service; those applicants having at least eighteen (18) months active duty and released under conditions other than dishonorable were awarded five (5) points upon proper verification. An additional five points could be earned for applicable work experience while in the military service. The term "applicable experience" is not defined in the Selection Procedures.

(e) *Work Experience.* Applicants are awarded points based upon prior work experience in the boilermaking or related trades. Applicants with at least six (6) months experience are awarded five (5) points and those with (1) year or more experience are awarded ten (10) points. The term "related trade" is not defined in the Selection Procedures.

(f) *Oral Interview.* Each applicant must report for an oral interview which accounts for a minimum of nine and a maximum of twenty-three rating points.

(31) The oral interviews take place during a set period of time usually spanning several consecutive days after all applications have been received. The Area Coordinator supervises and assists the Local Lodge in arranging the oral interviews but, as a practice, does not participate in the individual interviews of applicants. The Local Lodge arranges for interviewers to be present during the interviewing period. The Local Lodge contacts employers signatory to collective bargaining agreements with the Local Lodge and they are requested to select interviewers from their ranks to represent them at the oral interviews. The Local Lodge also selects interviewers from

its ranks and the interviewers usually work in teams, one interviewer selected by the Union and the other being an interviewer selected by employers. A majority of the individuals interviewed during the period of oral interviews for Local Lodge 667 in 1978 were interviewed by only one interviewer. The applicants, as is the practice, were assigned randomly to interviewers.

(32) The interviewers are gathered together at the outset of the oral interviews and the Area Coordinator reads the instructions relative to conducting the oral interview as set forth in the Selection Procedures. He also explains to the oral interviewers what they are to do if there are any questions but does not give them a copy of the instructions. The oral interviewers are asked to read the standard oral interview questionnaire which contains a set list of questions to be asked each of the applicants during the interview and the interviewers are told that they must ask the questions. The interviewers are told that at least one of the interviewers must complete the oral interview questionnaire as the questions are asked, recording the answers of the applicant. The Area Coordinator also explains to each of the interviewers how to mark the Interview Summary Record, form copies of which are given to each of the interviewers. The interviewers are instructed to check the category which they deem appropriate on the Interview Summary Record.

(33) At the conclusion of all interviews, the Summary Record is then transmitted along with all other records in each of the applicants' files to the offices of SAJAC where points are assigned to each of the categories according to the evaluation procedures set forth in the Selection Procedures. The total points received by the applicant in the oral interview as a result of the evaluation is then recorded on his/her Boilermaker Apprentice Evaluation Summary sheet in the appropriate column and the applicants are ranked according to such points.

(34) The following is applicant flow data for SAJAC between January 1, 1968 and December 31, 1979. The data is the combined total applicants and total admissions (indentured apprentices) to the apprenticeship program for all of the seventeen Locals within SAJAC's jurisdiction:

Southeastern Area

| Year | Total Applicants | Total Admissions | Percentage of Total Admissions To Total Admissions |
|---|---|---|---|
| 1968 | 82 | 31 | 37.8% |
| 1969 | 212 | 93 | 43.8% |
| 1970 | 336 | 106 | 31.5% |
| 1971 | 284 | 113 | 39.7% |
| 1972 | 496 | 114 | 22.9% |
| 1973 | 339 | 239 | 70.5% |
| 1974 | 250 | 165 | 66% |
| 1975 | 1012 | 149 | 14.7% |
| 1976 | 696 | 361 | 51.8% |
| 1977 | 1188 | 237 | 19.9% |
| 1978 | 1893 | 278 | 14.6% |
| 1979 | 593 | 341 | 57.5% |

(35) During the same period, the total female applicants to the apprenticeship program for all of the seventeen (17) Locals and the total females admitted were as follows:

Southeastern Area

| Year | Total Female Applicants | Total Female Admission | Percent |
|---|---|---|---|
| 1968 | 0 | 0 | — |
| 1969 | 1 | 0 | — |
| 1970 | 0 | 0 | — |
| 1971 | 0 | 0 | — |
| 1972 | 0 | 0 | — |
| 1973 | 0 | 0 | — |
| 1974 | 0 | 0 | — |
| 1975 | 1 | 0 | — |
| 1976 | 1 | 0 | — |
| 1977 | 3 | 1 | 33% |
| 1978 | 65 | 0 | — |
| 1979 | 23 | 1 | .0434% |

**Comparison of Male to Female Applicants**

| Year | Total Male Applicants | Total Female Applicants | Percent of Female to Male |
|---|---|---|---|
| 1968 | 82 | 0 | 0 |
| 1969 | 211 | 1 | .004 |
| 1970 | 336 | 0 | 0 |
| 1971 | 284 | 0 | 0 |
| 1972 | 496 | 0 | 0 |
| 1973 | 339 | 0 | 0 |
| 1974 | 250 | 0 | 0 |
| 1975 | 1011 | 1 | .0009 |
| 1976 | 695 | 1 | .0014 |
| 1977 | 1185 | 3 | .0025 |
| 1978 | 1828 | 65 | .0355 |
| 1979 | 570 | 23 | .0403 |

**Comparison of Male to Female Admissions**

| Year | Total Male Admissions | Total Female Admissions | Percent of Female To Male |
|---|---|---|---|
| 1968 | 31 | 0 | 0 |
| 1969 | 93 | 0 | 0 |
| 1970 | 106 | 0 | 0 |
| 1971 | 113 | 0 | 0 |
| 1972 | 114 | 0 | 0 |
| 1973 | 239 | 0 | 0 |
| 1974 | 165 | 0 | 0 |
| 1975 | 149 | 0 | 0 |
| 1976 | 361 | 0 | 0 |
| 1977 | 237 | 1 | .0042 |
| 1978 | 278 | 0 | 0 |
| 1979 | 341 | 1 | .0029 |

(36) During the period from January 1968 to December 31, 1979, there had been a total of ninety-four (94) female applicants and seven thousand two hundred eighty-seven (7,287) male applicants. The above data yields the following:

| Percent Female to Total Applicants | Percent Female to Male Applicants |
|---|---|
| .0127 | .0128 |

| Percent Female Admissions to Female Applicants | Percent Male Admissions to Male Applicants |
|---|---|
| .0212 | .3054 |

| Percent of Female Admissions to Male Admissions |
|---|
| .0008 |

(37) The following is the applicant flow data for Boilermaker Local Lodge 667 during the period between January 1, 1968, and December 31, 1979.

**Local Lodge 667**

| Year | Total Applicants | Total Eligible | Total Admissions |
|---|---|---|---|
| 1968 | 0 | | 0 |
| 1969 | 0 | | 0 |
| 1970 | 124 | 51 | 20 |
| 1971 | 0 | | 27 |
| 1972 | 137 | 101 | 12 |
| 1973 | 0 | | 0 |
| 1974 | 0 | | 0 |
| 1975 | 0 | | 0 |
| 1976 | 168 | 131 | 59 |
| 1977 | 0 | | 55 |
| 1978 | 457 | 351 | 44 |
| 1979 | | | 5 |

(38) The applicant flow data for Local Lodge 667 from 1968 through 1979 categorized by sex appears as follows:[8]

**Local Lodge 667**

| Year | Male Applicants | Eligible | Admissions | Female Applicants | Eligible | Admissions |
|---|---|---|---|---|---|---|
| 1968 | 0 | | | 0 | | |
| 1969 | 0 | | | 0 | | |
| 1970 | 124 | 51 | 20 | 0 | | |
| 1971 | 0 | | 27 | 0 | | |
| 1972 | 137 | 101 | 12 | 0 | | |
| 1973 | 0 | | 0 | 0 | | |
| 1974 | 0 | | 0 | 0 | | |
| 1975 | 0 | | 0 | 0 | | |
| 1976 | 167 | 130 | 59 | 1 | 1 | 0 |
| 1977 | 0 | | 54 | 0 | | 1 |
| 1978 | 454 | 349 | 44 | 3 | 2 | 0 |
| 1979 | 0 | | 5 | 0 | 0 | 0 |

8. Even though the parties' Agreed Statement of Facts contained pre-1972 applicant flow data, the Court has deemed it appropriate to disregard it. *See* note 2, *supra*. *Cf., EEOC v. United Virginia Bank*, 615 F.2d 147 (4th Cir.1980).

(39) The actual process of initiating applications for a pool of applicants eligible for entry into the apprenticeship program is initiated by a Local Lodge notifying the Area Coordinator that the Local desires a new list of applicants eligible for entry into the program within its jurisdiction. Upon receipt of such notification, the Area Coordinator discusses with the representatives of the Local Lodge the appropriate time period during which applications should be made available to prospective applicants and the preliminary dates for scheduling oral interviews of applicants to the program. After the period for taking applications is agreed upon, the Area Coordinator commences the process of disseminating information with respect to the availability of apprenticeship openings. The dissemination of the information is commenced at least 30 days prior to the date on which applications will first become available to interested persons.

(40) The Area Coordinator prepares a "Notice of Apprenticeship Openings" and sends copies of the same to the Alabama State Director of the Bureau of Apprenticeship and Training, United States Department of Labor who in turn then forwards copies of the Notice to his counterpart or responsible department in the locality of the Local Lodge which is opening its program. Notices are also sent to state employment agencies having employment referral services in the geographical jurisdiction of the Local Lodge as well as to various minority groups. Copies of the Notice of Apprenticeship Openings are also sent to the Local Lodge which posts copies at jobsites and at the Union hall. The Area Coordinator has not undertaken to place announcements with respect to the apprenticeship openings in the newspaper, radio or television. Prior to January, 1979, minority groups contacted by the Area Coordinator were those listed in the Directory for Reaching Minority Groups published by the United States Department of Labor, none of which included female groups. Subsequent to January, 1979, the Area Coordina-

tor has used the Directory for Reaching Minority and Women's Groups, a replacement publication of the United States Department of Labor to contact both minority and women's groups listed therein.

(41) In December, 1977, a representative of Boilermaker Local Lodge No. 667 which is located in Charleston, West Virginia, contacted SAJAC's Area Coordinator Larry Phillips and indicated that the Local Lodge desired a new list of applicants eligible for entry into the apprenticeship program within the Local's jurisdiction. During this initial contact, the representative for Local Lodge 667 and the Area Coordinator set dates for distributing applications and set dates for conducting the oral interviews. The representative of the Local Lodge also indicated it would be able to place approximately 40 applicants in its program during the succeeding two years. The Area Coordinator then prepared a "Notice of Apprenticeship Openings" a copy of which is Joint Exhibit No. 5. The information contained in the face of Joint Exhibit No. 5 is characteristic of the information contained on notices prepared for other Locals prior to their taking applications.

(42) The Area Coordinator sent copies of the Notice of Apprenticeship Openings to the Alabama State Director of the Bureau of Apprenticeship and Training, United States Department of Labor, requesting his assistance in disseminating information in connection with the opening of the program. A copy of said letter appears as Joint Exhibit No. 6.

(43) The Alabama State Director then forwarded copies of the Notice of Apprenticeship Openings to his counterpart in the State of West Virginia. Joint Exhibit No. 7 is a copy of the transmittal letter transmitting copies of the Notice of Apprenticeship Openings to Jesse James, Director of the Bureau of Apprenticeship Training, United States Department of Labor for the State of West Virginia and requesting his assist-

ance in the dissemination of the information.

(44) In addition, the Area Coordinator sent a copy of the Notice for Apprenticeship Openings to the following State Employment Agencies having employment referral services in the State of West Virginia, at the addresses set forth opposite their names.

| CITY OR TOWN | STREET ADDRESS | ZIP CODE |
| --- | --- | --- |
| Beckley | 300 S. Fayette St. | 25801 |
| Bluefield | 620 Raligh St. | 24701 |
| Charlestown | 1038 Quarrier St. | 25301 |
| Clarksburg | 165 W. Pike St. | 26302 |
| Elkins | 212 Davis Ave., Box 570 | 26241 |
| Fairmont | 213 Jackson St. | 26555 |
| Grafton | 201 E. Main St. | 26537 |
| Huntington | 1025 3rd Ave. | 25713 |
| Kingwood | 101 E. Main St. | 26537 |
| Logan | 195 Dingess St. | 25601 |
| Martinsburg | 309 W. King St. | 25401 |
| Montgomery | 407 4th Ave. | 25136 |
| Morgantown | 106 High St. | 26504 |
| Moundsville | 1005 2nd St. | 26041 |
| New Martinsville | 430 N. Main St. | 26155 |
| Oak Hill | 110 Lewis St. | 25901 |
| Parkersburg | 512–514 Julianna St. | 26101 |
| Point Pleasant | 225 6th St. | 25550 |
| Ronceverte | 209 W. Main St. | 24970 |
| Welch | 23–25 Elkhorn St. | 24801 |
| Weston | 101 Main Ave. | 26452 |
| Wheeling | 22 10th St. | 26003 |
| Williamson | 50 W. 2nd Ave. | 25661 |

(45) Furthermore, the Area Coordinator sent copies of the Notice of Apprenticeship Openings to the various minority groups listed below:

NAACP
Lonzo M. Ross, Pres.
Box 3367 Beckley, West Virginia 25801
NAACP
Rev. Carrolton N. Jackson, Pres.
323 N. Mercer St.
Bluefield, West Virginia 24701
304–325–6691
NAACP
Williard L. Brown, Legal Redress Chmn.
809 Walnut Street
Charleston, West Virginia 25312

NAACP
William Lonesome, Pres.
P.O. Box 733
Charleston, West Virginia 25306
NAACP
James Griffin, Pres.
313 Water Street
Clarksburg, West Virginia 26301
NAACP
Dowey W. Fox, Pres.
628 Monroe Street
Fairmont, West Virginia 26554
NAACP
Andrew McDade, Pres.
1658 Eighth Avenue
Huntington, West Virginia 25701
304–522–3221
NAACP
Herbert H. Henderson, State Pres.
317 Ninth Street
Huntington, West Virginia 25701
NAACP
Edward Marshal
1232 Montrose
Morgantown, West Virginia 26505
NAACP
R.L. Franklin, Pres.
529 West Race Street
Martinsburg, West Virginia 25401
304–263–3889
NAACP
Rev. Robert B. Powell, Pres.
1325 Oak Street
Parkersburg, West Virginia 26101
NAACP
Lawrence Smith, Pres.
17 McDowell Street
Welch, West Virginia 24801
NAACP
Rev. Leo Wright, Pres.
1025 Chapline Street
Wheeling, West Virginia 26003
NAACP
Howard J. Crump, Pres.
15 Rivaire Circle
White Sulphur Springs, West Virginia 24986

(46) The Area Coordinator also sent the Notice of Apprenticeship Openings to the Local Lodge 667 and the notices were posted on various job sites as well as the Local Lodge offices.

(47) An application register was maintained by Local Lodge 667 showing the names of persons who picked up and returned applications in 1978. The application register shows a total of four hundred fifty-four (454) persons obtained, completed and returned applications for entry into the Apprenticeship Program through Local Lodge 667 in 1978. Of those 454 persons, three were females, two of whom were the Plaintiffs. Each of the applicants at the time he/she returned his/her application was assigned a date to report for an oral interview.

(48) The oral interviews were conducted at the Charleston House, Holiday Inn, in Charleston, West Virginia during the period from February 20–24, 1978. At least 351 persons reported for the oral interviews and of those the Plaintiffs were the only two females. During the 5 day period of the interviews, 15 different persons appeared at various times to interview who were selected by companies as their representative interviewers. Four other interviewers were chosen by the Union. Tamara Bailey was interviewed by one interviewer named Gerald Petro who was at the time employed by the Union Boiler Company and was selected by Union Boiler Company as a company representative. Nancy Blake was interviewed by two interviewers, Omar E. Bradley being the Union representative and John Russell being the employer representative.

(49) At the conclusion of all the interviews, the applicants' files containing their application, oral interview questionnaires, oral interview summary sheets, as well as supporting documents which the applicants had brought to the oral interview were transmitted to SAJAC's area office in Florence, Alabama.

(50) Copies of the contents of the file of Plaintiff Tamara Bailey appears as Joint Exhibit No. 3. Copies of the contents of the file of Nancy Blake appears as Joint Exhibit No. 4. The form documents entitled Boilermaker Apprentice Evaluation Summary, Boilermakers National Apprenticeship Program Interview summary Record, Interview Questionnaire, and application for Boilermaker Apprenticeship Training contained in the files of the Plaintiffs are exactly like those used for each applicant to the program.

(51) The Area Coordinator and his assistant processed the applications and compiled an eligibility roster for Local Lodge 667 containing the names of persons eligible for entry into the Apprenticeship Program through that Local, ranking them in order as determined by points received. A copy of the eligibility roster for Local Lodge 667 prepared in 1978 as a result of the application process appears as Joint Exhibit No. 9.

(52) Of the 454 persons who submitted applications in 1978 for admission to the apprenticeship program for Local 667, 351 appeared for interviews and had their names placed on the eligibility roster. Of those 351 names on the eligibility roster, 48 were referred as apprentices by Local Lodge 667 and indentured into the apprenticeship program. In order to obtain 48 indentured apprentices, the Local invited 59 persons off of the list. All persons who received such invitations were male. The 59 persons invited for induction were those whose names appear as 1 through 59 on the eligibility roster for Local Lodge 667.

(53) None of the persons whose names appear on the eligibility roster for Local Lodge 667 compiled in 1978 were notified merely of their acceptance into or rejection from the pool of eligible applicants to the Apprenticeship Program. Neither of the Plaintiffs received any notification either of acceptance or rejection.

(54) The total highest points awarded any applicant on Local 667's eligibility roster was 45 while the lowest score of any person indentured was 32. The range of successful total scores of those indentured was 13 points.

(55) Plaintiff Tamara Bailey had a total of 25 points. She received one (1) point for math grades in high school and one (1) point for science grades. She also received five points for having in excess of six (6) months of work experience at the boilermaking trade. She received a total of 18 points on the oral interview.

(56) Plaintiff Nancy Blake received a total score of 16 points. She received one point for science grades in high school and one point for grades in shop. She received a total of 14 points on the oral interview.

(57) Of the 59 persons contacted by Local Lodge 667 for referral as apprentices from the 1978 eligibility roster, 36 or 61 per cent received 23 points, the maximum allowable points, on the interview portion of the evaluation; 55 or 93 percent received higher interview scores than Plaintiff Bailey and 58 or 98 percent received higher interview scores than Plaintiff Blake; ten or 16.9 percent received points for previous military experience; 44 or 75 percent received points for prior work experience at the Boilermaker or related trade; 39 or 66 percent received points for grades in shop classes; 22 or 37 percent received points for education received in college.

(58) All of the aforementioned 59 persons indicated in response to a question asked during the oral interview that they had received information relating to the Apprenticeship Program from either members of their families, from friends, from other boilermakers, from Local Lodge 667 or its members, or at their places of employment. One such person indicated he had learned of the program through welding school. Plaintiff Tamara Bailey indicated that she learned of the program from her father who is a boilermaker in Local 667. Plaintiff Nancy Blake indicated that she learned of the apprenticeship program from a friend. Various other applicants interviewed during the same period as Plaintiffs indicated having learned of the program in addition to the foregoing methods from bulletin board postings, unemployment offices, welfare departments, apprentices, trade schools, ads in the newspaper, and on construction jobs.

(59) All those persons whose names appear on the eligibility roster for Local Lodge 667 (Joint Exhibit No. 9) were eligible for entry into the apprenticeship program within the territorial jurisdiction of Local Lodge 667. As Local Lodge 667 was able to place apprentices in employment with employers operating within its jurisdiction, it notified the Area Coordinator of the names of the individuals who were being so placed in the program. The Area Coordinator then set forth opposite the individual's name on a copy of the eligibility roster maintained at SAJAC offices the date such person was first referred as an apprentice. The Area Coordinator thereafter sent to the individual initial documents which included an indenturement agreement.

(60) The apprenticeship training program consists of on-the-job training as well as a correspondence course which must be completed. SAJAC monitors the apprentices' progress through a system of job reports which the apprentices are required to make as well as lesson materials which the apprentice must return to SAJAC.

(61) Local Lodge 667 operated at all times material hereto a referral service referring to employers requesting the same qualified field construction boilermakers, apprentices, and other applicable classifications. The Local referred employees for employment either as journeymen (which consisted of graduate apprentices or individuals who have completed 8,000 hours of practical experience working at the boilermaking trade) apprentices, or trainees, (individuals who have less than 8,000 hours of practical experience working at the field construction boilermaking trade). Both plaintiffs have on occasions been referred as trainees by Local Lodge 667.

(62) Plaintiffs were not among those who were selected to be apprentices. In June, 1978, both plaintiffs filed with the West Virginia Human Rights Commission a charge of sex discrimination against Local Lodge 667 and SAJAC. Plaintiffs were issued Right to Sue letters by the United States Equal Employment Opportunity Commission (EEOC) dated October 12, 1978. Both plaintiffs received their Right to Sue notices in the mail via certified mail, return receipt requested from EEOC. A carbon copy of each of the Right to Sue letters was also sent to Plaintiffs' counsel.

(63) On January 15, 1979, Plaintiffs filed this action against Local Lodge 667, SAJAC, and others. On November 29, 1979, this Court entered its Memorandum Opinion and Order granting Defendant SAJAC's Motion to Quash Attempted Service of Process and giving Plaintiffs a reasonable time within which to effect service upon this Defendant. The Court also held that Plaintiffs had stated a cause of action in their original complaint under 42 U.S.C. § 1985(3), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, and under the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*

(64) On July 23, 1980, the Plaintiffs filed an amended Complaint adding allegations of sexual harassment against Local Lodge 667. Answers to the Amended Complaint were filed and subsequent thereto on October 27, 1980, Plaintiffs and Local Lodge 667 submitted for the Court's approval an offer of settlement and this Court approved the settlement offer and dismissed as Defendant herein Boilermaker Local Lodge 667 of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, William McCormick and Richard E. Bradley, leaving as a sole Defendant Southeastern Area Joint Apprenticeship Committee.

(65) With the dismissal of Local Lodge 667, Plaintiffs sole and remaining claim is premised upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended. The Plaintiffs are challenging the apprenticeship selection process and are alleging it has a disparate impact upon females as a class and that Plaintiffs have thereby suffered injury. The criteria alleged to have a disparate impact upon females are:

(a) Awarding points for grades in high school shop classes;

(b) Awarding points on the basis of vocational school education;

(c) Awarding points on the basis of prior military service;

(d) Awarding points for prior work experience in the boilermaker trade or related trades;

(e) Awarding points on the basis of the interview evaluation;

(f) Certain questions propounded to the various applicants to the apprenticeship program. The challenged questions appear on the standard oral interview questionnaire exemplified by those contained in Plaintiffs' file (Joint Exhibit Nos. 3 and 4):

(1) Question 2, 2a, 2b, 5 and 7, relating to education.

(2) All of the questions relating to military service.

(3) Questions 8 and 9 relating to work history.

(4) Questions 1, 1a, 1b, 5, 6 and 9, relating to personal questions.

(5) Questions 1 and 9 relating to interest.

(66) The affirmative action plan contained in the Selection Procedures effective March, 1972, (Joint Exhibit No. 2) contains a goal of total minority group participation for SAJAC's entire jurisdictional area of 19%. The goal was developed under the then existing Department of Labor regulations found at 29 C.F.R. Part 30 which required affirmative action for minority groups, but not women. The 19% figure was not contemplated as a goal for female participation in the program at the time that it was adopted and approved by the Department of Labor by either SAJAC or the Department of Labor.

(67) The affirmative action plan contained in the Selection Procedures which became effective in October, 1978, was developed in accordance with the then newly adopted Department of Labor regulations now found at 29 C.F.R. Part 30. The Department of Labor regulations adopted in May, 1978, contained for the first time affirmative action requirements in connection with females.

(68) No formal predictive validation studies of the type set forth in the uniform guidelines on employee selection procedures have been conducted of the selection, screening or ranking procedure utilized by SAJAC during the period from 1968 to the present.

## C. *Testimony*

Though the Court considered the testimony of the Plaintiffs' first witness, Ann Owings Jones, to be admissible, it gave little weight to her testimony. While Jones certainly was experienced as an employment counselor and also had experience in administering tests or screening mechanisms generally, she nevertheless showed little knowledge of the validation of such tests or screening mechanisms. Accordingly, the Court found her testimony in many respects to be irrelevant. On the other hand, the Court does find some of her statements to be corroborative of Ellen Frank's testimony.

■ Laxmi Mehra based his testimony on a Chi Square statistical analysis of the Defendant's applicant flow data for the years 1968 through 1979. Mehra aggregated such data from all of the locals in SAJAC's jurisdiction, doing so for the avowed purpose of having a large enough data base so as to be able to derive some meaningful comparisons by way of statistical analysis. If Mehra's analyses were relevant, it would show to a reasonable degree of statistical certainty that the Defendant's screening mechanism had a disparate impact on women generally throughout SAJAC's operational area. Based upon the uncontroverted testimony of Larry Phillips, SAJAC's Area Coordinator, however, the Court finds that each local in the Defendant's jurisdiction is autonomous, in that each gathers and maintains its own applicant list and that an applicant on one local's list may not cross over to another local's applicant list.[9] The Court concludes, therefore, that Mehra's testimony is irrelevant to the matter at hand, inasmuch as it is based upon a statistical analysis of the aggregate applicant flow data in SAJAC's seventeen locals.

The Defendant's statistition, Chris Kukuk, for purposes of his analysis, factored out those portions of the Defendant's screening mechanism which the Plaintiffs assailed as not being work related and as having a disparate impact on women [10] and, assuming the validity of the remainder of the screening mechanism, proceeded to rerank the Plaintiffs among the 1978 array of applicants. Dr. Kukuk's reranking of the applicants resulted in Plaintiffs Bailey and Blake advancing among the array of applicants to the 80th and 170th positions respectively. Both, however, still fell short of the qualified group of 59 [11] applicants who received invitations to be inducted into the apprenticeship program in 1978. The Court credits Dr. Kukuk's analysis and Mr. Phillips' testimony, thus making Kukuk's analysis relevant on a statistical basis, insofar as the Court assigns relevance to statistics in this case.[12] Accordingly, the Plaintiffs have failed to prove their case by a preponderance of the evidence through proof of actual statistical disparity as it relates to the two of them personally.

In considering the remainder of the critical testimony in the case, the Court finds the Plaintiffs' witness, Ellen Frank, to be very qualified, knowledgeable and experienced in the area in which she testified. The Court was particularly satisfied with her precise approach to the matters in issue and found her testimony to be extremely helpful to the Court. The Court further finds that the Defendant's witness, Raymond Goetz, was a valuable occurrence witness, as well as a relevant, though less valuable, expert witness. The Court also finds that the Defendant's witness, Chris Martin, was qualified in the area of devel-

---

**9.** Phillips testified that a cross over can only occur once an applicant has already been accepted into the apprenticeship program and where the Business Agents of both locals agree to the cross over.

**10.** *See* ¶ 65 of the Agreed Statement of Facts, *supra.*

**11.** *See* ¶ 52 of the Agreed Statement of Facts, *supra.*

**12.** Inasmuch as there was no evidence which would indicate that the unchallenged criteria, which provided the basis for Kukuk's reranking, constituted a valid screening mechanism, the Court assigns no particular weight or relevance to Kukuk's conclusion that the Plaintiffs still fell short of the qualified group of applicants.

oping, evaluating and rating screening mechanisms and is qualified, as is Dr. Frank, in the field of organizational personnel psychology. Comparatively, however, the Court was more impressed with the preciseness of Dr. Frank's application and statement of knowledge than it was with Dr. Martin's and, accordingly, gives her testimony greater weight.

In evaluating the testimony of Drs. Frank, Goetz and Martin, and further considering the occurrence testimony of Larry Phillips [13] the Court finds that the Defendant's screening mechanisms had a disparate impact on these women in 1978, when they applied for admission to the Defendant's apprenticeship program.[14]

Beginning in late 1964 and continuing throughout the late 1960's, the Defendant determined that it had an obligation to comply with the dictates of Title VII. Accordingly, SAJAC secured the services of Professor Goetz to provide it with legal advice, to serve as a scriviner in the development of a written program, to set up a neutral screening mechanism and to coordinate the Defendant's overall compliance effort. Even though SAJAC undoubtedly developed its screening mechanism in good faith, the Court finds that it did so informally and unprofessionally.[15] As reflected by Professor Goetz' own testimony, the Defendant's screening mechanism was developed in blissful ignorance of its possible impact on women as a protected class under Title VII.[16]

The Agreed Statement of Facts [17] and Phillips' testimony indicates that the Defendant's screening mechanism was not modified to extend any special protections, or to demonstrate any special awareness of the rights of women applicants between its approval in 1972,[18] and early 1978 when the Plaintiffs applied for admission into Local 667's apprenticeship program. Furthermore, since the screening mechanism was essentially developed between 1964 and 1972, the Court can only infer that it was developed only with an awareness of the standards of neutrality towards minority groups generally, unmindful of standards of neutrality towards the newly protected class of women applicants.[19]

■ After having heard all of the testimony in this action, and having carefully reviewed the parties' Agreed Statement of Facts, as well as the other exhibits which have been introduced into evidence, the Court finds that there are a number of factors in the Defendant's screening mechanism which have a disparate impact on

13. As SAJAC's Area Coordinator since 1976, Phillips has generally been in control of the Defendant's screening mechanism. The Court finds nothing in Mr. Phillips' administration of the screening mechanism which would evidence intentional discrimination against neither women as a class, nor these particular women Plaintiffs. Rather, the Court is focusing, as it must, on the development and implementation of SAJAC's screening mechanism and how it impacts women applicants, generally, and these Plaintiffs, particularly.

14. Inasmuch as the two individual Plaintiffs are women, the Court has had to look to the protected class of women generally when determining whether the Defendant's screening mechanism had a disparate impact on these particular Plaintiffs. The Court has done so fully aware that this is *not* a class action. *See e.g., McDonnell Douglas Corporation v. Green, supra.*

15. Professor Goetz testified that the Defendant's screening mechanism was largely developed in light of experienced boilermakers' response to the question, "What does it take to become a boilermaker?"

16. Inasmuch as Title VII did not proscribe employers and unions from discriminating against *applicants* on the basis of their sex until March 24, 1972, such ignorance on the Defendant's part is certainly understandable.

17. *See* ¶ 9 of the Agreed Statement of Facts, *supra.*

18. The Defendant's screening mechanism which the Plaintiffs encountered in early 1978 was essentially developed between 1964 and 1972, and was approved, on March 29, 1972, by the Bureau of Apprenticeship and Training of the United States Department of Labor.

19. In 1978, therefore, the Plaintiffs confronted a screening mechanism which was designed in the late 1960's in the midst of a social environment which Professor Goetz astutely characterized as one in which women were only beginning to have aspirations.

women in general and, moreover, which had a disparate impact on these particular female Plaintiffs. The most obvious being the Defendant's interview questions concerning an applicant's prior military service.[20] Title VII, unlike various other statutes and government regulations which have been enacted since World War II, does not accord veterans any employment preferences. Rather, Title VII seeks to secure equality of employment opportunity for members of certain protected classes. Inasmuch as veterans are not a protected class under Title VII, the statute leaves no room for a veteran preference which has a disparate impact on a protected class, e.g., women. In viewing the Defendant's interview questions concerning prior military service, therefore, the Court must be mindful of these Title VII Plaintiffs' situations as women who are seeking admission to the boilermaker trade.

■ Furthermore, questions which open an employment interview asking about prior military service can be viewed, on the one hand, as tension breakers designed to relax the interviewee. On the other hand, when such opening questions are directed to members of a protected class who in all likelihood do not satisfy the initial qualification of prior military service, they can have an interim effect on the interviewee and can certainly be a discouragement in proceeding to the next step of the interview. Considering the statistical evidence that in 1978 only a small segment of the female population had prior military service, the Court finds that the Defendant's questions about prior military service had such an interim effect on these Plaintiffs.

Moreover, the Defendant's scoring of these questions had a disparate impact on these Plaintiffs.

Likewise, the Court finds that the Defendant's questions concerning prior vocational training, shop classes and prior work experience in the boilermaker trade,[21] and the significant weight which the Defendant gave to the interviewee's responses to these questions had a disparate impact on these Plaintiffs, in light of the statistical evidence that in 1978 only a small segment of the female population had prior vocational training, shop classes, or prior work experience in the boilermaker trade.

■ The Court further finds that the Defendant has not met its[22] burden of showing a legitimate business necessity for, and a lack of less restrictive alternatives to its interview questions concerning prior military service, prior vocational training, prior shop classes, prior work experience in the boilermaker trade, and the significant weight which it assigned to the Plaintiffs' responses to these questions.

Furthermore, while the interviewers may have been experienced in the field to which the applicants were seeking entry, the Court finds that they were not experienced and sophisticated interviewers. Recognizing this problem, the screening mechanism purports to provide the interviewers with detailed instructions for them to follow in conducting the interviews. Based upon its consideration of the testimony and other evidence in the case, however, the Court finds that the novice interviewers were only given ambivalent instructions, likely to re-

---

**20.** These questions were prompted by the Defendant's underlying assumption that prior military service has some direct relevance as a job criterion for being accepted into the boilermaker trade. The Court recognizes that some occupational qualifications or specializations, which are similar to those required of a boilermaker, can be acquired during military service. The Court further recognizes that questions concerning prior military service may have some tangential relevance in that an applicant's successful completion of military service is conceivably indicative of his or her general ability to work in a group.

**21.** The Court finds that the Defendant's assigning weight to prior work experience in the boilermaker trade, or related trades, to be particularly incongruous in relation to an apprenticeship program and the entry into a field by a person who otherwise meets the minimum qualifications.

**22.** See, e.g., Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.) cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 665 (1971).

sult in one method of appraisal by one interviewer and another method of appraisal by another interviewer.

Crediting both Dr. Martin's testimony that the Defendant's screening mechanism is far more sophisticated than those which he finds many other employers are using, and Dr. Frank's testimony that this screening mechanism, which has not been materially altered since 1972, does not approach a minimum level of acceptable validity, the Court finds that the Defendant's screening mechanism, which the Plaintiff encountered in 1978, was faultily designed. Moreover, the Court finds that the Plaintiffs have proved by a preponderance of the evidence that: (1) they are members of a protected class; (2) that they applied for admission into the Defendant's apprenticeship program; (3) that they were rejected by what appeared to be a neutral screening mechanism, but which contained inherent defects in its overall design, implementation and operation, thereby having a disparate impact on women, in general, and on these Plaintiffs, in particular, thereby precluding their acceptance into the program; while (4) men of similar or less qualifications were accepted into the program. The Court further finds that the Defendant has failed to prove by a preponderance of the evidence that the screening mechanism which the Plaintiffs encountered in 1978 was "a reasonable measure of job performance." Accordingly, the Court concludes that the Defendant has violated the Plaintiffs' rights under Title VII of the Civil Rights Act of 1964.

The Court directs counsel of record to notify the Court within forty-five days of the entry of this Memorandum Opinion and Order as to whether the parties can agree on an appropriate remedy, or whether further proceedings are required in this action.